HOLDRIDGE, J.
The defendant, Covonta Magee, was charged by grand jury indictment with second degree murder, a violation of La. R.S. 14:30.1, and pled not guilty.[1] After a *155 trial by jury, the defendant was found guilty as charged. The defendant was sentenced to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.[2] The trial court denied the defendant's motion for new trial. The defendant now appeals, assigning error to the trial court's denial of his motion to suppress, his constitutional right to present a defense, and the sufficiency of the evidence. For the following reasons, we affirm the conviction and sentence.
STATEMENT OF FACTS
On December 22, 2012, officers of the Baton Rouge Police Department (BRPD) were dispatched to the scene of a shooting at 1511 Cristy Drive in Baton Rouge. The body of the victim, Clara Seal, was located at the scene and transported to the hospital by EMS. The victim's cell phone was also recovered and collected. Chelsea Daigle, who referred to the victim (whom she called C.J.) as her friend, indicated that on the day in question, she told the victim that they were going to Cristy Drive to obtain "roxies" (Roxicodone pills) from someone who she referred to as "T." However, Daigle was instead bringing the victim to that location to meet "Vonta," the defendant. Once they arrived at Cristy Drive, they parked their vehicle and entered the defendant's vehicle, which was parked in reverse in a driveway.[3] The victim sat in the front passenger seat, while Daigle got in the back of the defendant's vehicle. The defendant instructed Daigle to look in the back of the vehicle for some pills. He then demanded the victim to give him her possessions, and as she refused, he pulled her jacket and repeated his demands. As the victim attempted to exit the vehicle, the defendant shot her.
According to Dr. William Clark, the Coroner of East Baton Rouge Parish, the victim suffered gunshot wounds to the left arm just above the elbow and the left flank area. The victim's cause of death was determined to be the gunshot wound to the abdomen, and the manner of death was homicide. At the autopsy, Corporal Matthew Kelly of the BRPD crime scene division collected the victim's clothing, DNA samples, and a bullet removed from her abdomen, and sent the items to the Louisiana State Police Crime Lab.
Detective Logan Collins and Detective Steven Woodring of the BRPD homicide division processed the scene of the shooting and interviewed witnesses, including Brittany Kimble,[4] who described the defendant's vehicle as a gray or brown 2000 Chevrolet Impala. The detectives further received information leading to 3441 O'Neal Lane, the defendant's address. After arriving at the address on O'Neal Lane, the police located the vehicle and obtained a search warrant for apartment C, identified as the defendant's apartment. Upon executing the search warrant, the police recovered a Taurus model 85 loaded silver revolver, and .38 special ammunition, and a cell phone. The Chevrolet Impala was processed and swabs of suspected blood from the passenger and driver doors and baseboard were sent to the crime lab.
*156 SUFFICIENCY OF THE EVIDENCE
In assignment of error number three, the defendant argues that the evidence was insufficient to support the conviction. The defendant contends that the State was highly reliant on the testimony of Daigle, who initially identified "T" as the shooter. The defendant claims that Daigle's testimony had many "glitches" and further describes Daigle's testimony as biased, unreliable, and self-serving. The defendant contends that Daigle identified him as the shooter after the fourth police interrogation and a third photographic lineup. Further, the defendant notes that Daigle admitted to ingesting drugs on the night of the shooting. The defendant also argues that Daigle's testimony that the victim was shot as she exited the passenger door of the vehicle is inconsistent with the Coroner's testimony that there was a downward projection of the bullet. The defendant notes that Daigle testified that her charge would be reduced to armed robbery in exchange for her testimony, further arguing that there was no evidence that the victim was robbed. Finally, the defendant argues that absent Daigle's testimony, the jury may have believed that the gun did not belong to the defendant, noting that other adults were in the apartment. Thus, the defendant concludes that the evidence was insufficient to prove beyond a reasonable doubt that he committed second degree murder.
When issues are raised on appeal contesting the sufficiency of the evidence and alleging one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 43, 101 S.Ct. 970, 972, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proven beyond a reasonable doubt. When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion of trial error issues as to that crime would be pure dicta since those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the other assignments of error to determine whether the accused is entitled to a new trial. If the reviewing court determines that there has been trial error (which was not harmless) in cases in which the entirety of the evidence was sufficient to support the conviction, then the accused will be granted a new trial, but is not entitled to an acquittal. See Hearold, 603 So.2d at 734.
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const. amend. XIV ; La. Const. art. I, § 2. The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. See La. Code Crim. P. art. 821(B) ; State v. Ordodi, 2006-0207 (La. 11/29/06), 946 So.2d 654, 660. In conducting this review, we also must be expressly mindful of Louisiana's circumstantial evidence test, which states in part, "assuming every fact to be proved that the evidence tends to prove," every reasonable hypothesis of innocence is excluded. La. R.S. 15:438.
*157 State v. Wright, 98-0601 (La. App. 1st Cir. 2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La. 10/29/99), 748 So.2d 1157 & 2000-0895 (La. 11/17/00), 773 So.2d 732.
Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder, in pertinent part, as the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. Specific criminal intent is that "state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Though intent is a question of fact, it need not be proven as a fact. It may be inferred from the circumstances of the transaction. Thus, specific intent may be proven by direct evidence, such as statements by a defendant, or by inference from circumstantial evidence, such as a defendant's actions or facts depicting the circumstances. Specific intent is an ultimate legal conclusion to be resolved by the fact finder. State v. Buchanon, 95-0625 (La. App. 1st Cir. 5/10/96), 673 So.2d 663, 665, writ denied, 96-1411 (La. 12/6/96), 684 So.2d 923.
The State bears the burden of proving those elements, along with the burden to prove the identity of the defendant as the perpetrator. State v. Draughn, 2005-1825 (La. 1/17/07), 950 So.2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. A positive identification by only one witness is sufficient to support a conviction. State v. Weary, 2003-3067 (La. 4/24/06), 931 So.2d 297, 311, cert. denied, 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006), quoting State v. Neal, 2000-0674 (La. 6/29/01), 796 So.2d 649, 658, cert. denied, 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002).
Dr. Clark testified that the projectile travelled to the victim's right side flank, opposite of the bullet hole, indicating a downward departure. The victim had stipplings (gases and carbon materials that come out of the end of the gun, as well as the bullet, cause stippling or tattooing on the skin) on her arm wound which was considered a medium range gunshot wound. However, no stippling was noted on the flank wound, which was determined to be an intermediate range gunshot wound. Dr. Clark noted that clothes may have prevented stippling, the victim's arm may have been blocking her flank, or the firing distance between the victim's arm and the gun, varied from the firing distance between the victim's flank and the gun. Blood and urine were drawn at the autopsy, and specimens were sent to the crime lab. The victim had no alcohol in her system, but there was the presence of pain medications, muscle relaxers, and an anti-anxiety medication (hydrocodone, oxycodone, tramadol, soma, and meprobamate ).
After learning of Daigle's involvement, the police located Daigle and obtained a warrant for AT & T cell phone records from December 21-23, 2013, for the cell phone number provided by Daigle. The defendant's name was discovered as a person who had been associated with Joshua Greene, whose phone number was part of the records. While Greene did not match the description of the shooter, dark-skinned and pointy nosed, the defendant did. During the execution of the search warrant for the defendant's apartment, in addition to recovering the firearm, the police dialed the phone number that the victim and Daigle used to communicate with on the night in question. Once they dialed the number, the officers heard a cell phone ringing underneath the bed.
*158 Daigle testified that both she and the victim had the defendant's phone number, and that she communicated with the defendant by text message that night prior to the meeting. Daigle knew there were no pills in the back of the car but pretended to look after the defendant indicated that they were in the back of the vehicle. Just before being shot, the victim refused to give the defendant anything stating, "No... you're just going to have to shoot me." Daigle stated that she saw the gun used by the defendant, noted that it was a silver revolver, and stated that she saw it when it was fired. When she talked to the police later that night she told them everything but did not give the correct identity of the shooter, only identifying the shooter as "T" instead of the defendant. She further did not identify the defendant as the shooter after being shown two separate photographic lineups.
Daigle, during a later police interview, finally, "told them the truth," identifying the defendant as the shooter. She testified that at that point she wanted to "get it off [her] chest." Subsequent to that interview, Daigle identified the defendant as the shooter in a photographic lineup. She confirmed that both she and the defendant knew that the victim had money on her person that night, and the defendant planned to take the money from the victim and share it with Daigle. Daigle indicated that Roxicodone and oxycodone were her drugs of choice and stated that she had taken at least one of drugs on the night in question. She also stated that before the shooting, she knew that the victim wanted drugs. She responded positively when asked if she wanted to get revenge against the victim for a prior disagreement. Daigle again at trial identified the defendant as the shooter, testified that she had known and seen the defendant before the shooting, and stated that she was one hundred percent certain that he was the shooter.
Phillip Simmers, an expert DNA analyst of the Louisiana State Police Crime Lab, determined that the blood samples taken from the front-passenger door frame of the defendant's vehicle were consistent with the DNA profile obtained from the victim. He was unable to draw any conclusions regarding the samples from the driver's-door handle and the revolver. Charles Watson, a forensic scientist of the Louisiana State Police Crime Lab and expert in firearm examination, compared the bullet collected from the victim in this case with the revolver located at the defendant's apartment and determined that the bullet was fired from the Taurus revolver.
The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. State v. Richardson, 459 So.2d 31, 38 (La. App. 1st Cir. 1984). Unless there is internal contradiction or irreconcilable conflict with the physical evidence, the testimony of a single witness, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall, 2004-3139 (La. 11/29/06), 943 So.2d 362, 369, cert. denied, 552 U.S. 905, 128 S.Ct. 239, 169 L.Ed.2d 179 (2007). It is the fact finder who weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. See State v. Hughes, 2005-0992 (La. 11/29/06), 943 So.2d 1047, 1051.
The verdict returned indicates the jury believed that Daigle was being truthful at the time of her trial testimony. In reviewing the evidence, we cannot say that the jury's determination was irrational under the facts and circumstances presented to them. See Ordodi, 946 So.2d at 662. Daigle testified that before the shooting she knew the defendant and made arrangements with him. Though she was admittedly using drugs on the day in question and initially misidentified the shooter, *159 she testified that she subsequently decided to be truthful and was certain that the defendant was the shooter. Further, the weapon used in the shooting and the cell phone used to communicate with the victim and Daigle the night of the shooting were located in the defendant's apartment. Finally, while the defendant argues otherwise on appeal, there was no testimony that the downward trajectory of the bullet was inconsistent with Daigle's account as to how the shooting occurred. An appellate court errs by substituting its appreciation of the evidence and credibility of witnesses for that of the fact finder and thereby overturning a verdict on the basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury. State v. Calloway, 2007-2306 (La. 1/21/09), 1 So.3d 417, 418 (per curiam). A court of appeal impinges on a fact finder's discretion beyond the extent necessary to guarantee the fundamental protection of due process of law in accepting a hypothesis of innocence that was not unreasonably rejected by the fact finder. See State v. Mire, 2014-2295 (La. 1/27/16), --- So.3d ----, ----, 2016 WL 314814, *4 (per curiam). After a thorough review of the record, we are convinced that a rational trier of fact, viewing the evidence presented in this case in the light most favorable to the State, could find that the State proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all of the elements of second degree murder and the defendant's identity as the perpetrator. Accordingly, assignment of error number three lacks merit.
MOTION TO SUPPRESS
In assignment of error number one, the defendant argues that the trial court erred in denying his motion to suppress based on the police searching his mailbox and seizing a letter therefrom without a search warrant. The defendant contends that the police obtained a search warrant for his residence based on the letter, and notes that the letter was later introduced into evidence at trial. Thus, the defendant claims that the letter was important because the address on the letter was used to obtain the search warrant. He claims that the police needed his apartment number to obtain the search warrant. Noting that it is illegal to steal mail from a mailbox, the defendant argues that the police violated his reasonable expectation of privacy by seizing mail from his mailbox. The defendant thus contends that his apartment number was unlawfully obtained by the illegal search of his mailbox. He concludes that the revolver recovered during the execution of the search warrant for his apartment should have been suppressed.
The Fourth Amendment to the United States Constitution and Article I, § 5 of the Louisiana Constitution prohibit unreasonable searches and seizures. A defendant adversely affected may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. La. Code Crim. P. art. 703(A). The crucial question in cases such as this is whether or not there is a legitimate expectation of privacy. United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) ; State v. Hines, 323 So.2d 449, 450 (La. 1975) ; State v. Paulson, 98-1854 (La. App. 1st Cir. 5/18/99), 740 So.2d 698, 700. Federal and state constitutional protections against unreasonable searches exist only when an individual has an actual expectation of privacy that society is prepared to recognize as reasonable. If it is determined that the accused has no reasonable expectation of privacy in the area invaded, neither a warrant nor an exception to the warrant requirement is needed for the seized evidence to be admissible. See *160 Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) ; Paulson, 740 So.2d at 700-01. Thus, the test by which a person's "expectation of privacy" is measured is twofold: first, the person must exhibit an actual subjective expectation of privacy and, second, the expectation must be one that society is prepared to recognize as reasonable. Paulson, 740 So.2d at 701.
A police officer needs both probable cause to arrest or search and exigent circumstances to justify a non-consensual warrantless intrusion into private premises. State v. Brisban, 2000-3437 (La. 2/26/02), 809 So.2d 923, 927. Probable cause for a search exists when facts within the officer's knowledge and of which he has reasonable and trustworthy information are sufficient to justify a reasonable man in the belief that the place to be searched will contain the object of the search. Examples of exigent circumstances have been found to be escape of the defendant, avoidance of a possible violent confrontation that could cause injury to the officers and the public, and the destruction of evidence. State v. Hathaway, 411 So.2d 1074, 1079 (La. 1982). This list is only illustrative and not exclusive. State v. Brumfield, 2005-2500 (La. App. 1st Cir. 9/20/06), 944 So.2d 588, 595, writ denied, 2007-0213 (La. 9/28/07), 964 So.2d 353. The United States Supreme Court in Illinois v. McArthur, 531 U.S. 326, 331, 121 S.Ct. 946, 950, 148 L.Ed.2d 838 (2001) has defined exigent circumstances as "a plausible claim of specially pressing or urgent law enforcement need."
The United States Supreme Court has held that unconstitutionally obtained evidence may be admitted at trial if it would inevitably have been seized by the police in a constitutional manner. Nix v. Williams, 467 U.S. 431, 444, 104 S.Ct. 2501, 2509, 81 L.Ed.2d 377 (1984). The inevitable discovery doctrine "is in reality an extrapolation from the independent source doctrine: Since the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." Murray v. United States, 487 U.S. 533, 539, 108 S.Ct. 2529, 2534, 101 L.Ed.2d 472 (1988) (emphasis in original). Pursuant to the independent source doctrine, "information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source." Id. at 538-39, 108 S.Ct. 2529. The United States Supreme Court further affirmed that, under the "independent source" doctrine, if the police have an "independent source" for the discovery of the evidence, the exclusionary rule has no applicability. See Segura v. U.S., 468 U.S. 796, 805, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984).
A functional similarity exists between the independent source and inevitable discovery doctrines because both seek to avoid excluding evidence the police "would have obtained ... if no misconduct had taken place." The State therefore bears the burden of providing by a preponderance of the evidence that "the information ultimately or inevitably would have been discovered by lawful means ..." Nix, 467 U.S. at 444, 104 S.Ct. at 2509 ; State v. Vigne, 2001-2940 (La. 6/21/02), 820 So.2d 533, 539. Application of the inevitable discovery doctrine thus "involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment...." Nix, 467 U.S. at 444 n.5, 104 S.Ct. at 2509 n.5 ; Vigne, 820 So.2d at 539.
Integral to the proper application of the inevitable discovery doctrine is a finding that law enforcement would have inevitably secured the evidence by lawful means, not simply that they could have. Thus, a mere showing that the police had *161 probable cause for a search and could have secured a warrant from a neutral magistrate does not satisfy the doctrine, because it would effectively obviate the Fourth Amendment preference for warrants and reduce the exclusionary rule to cases in which the police lack probable cause. State v. Lee, 2005-2098 (La. 1/16/08), 976 So.2d 109, 127, cert. denied, 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008), citing United States v. Elder, 466 F.3d 1090, 1091 (7th Cir. 2006) ("The usual understanding of that doctrine is that the exclusionary rule should not be applied when all the steps required to obtain a valid warrant have been taken before the premature search occurs.").
A trial court's ruling on a motion to suppress the evidence is entitled to great weight, because the court had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Jones, 2001-0908 (La. App. 1st Cir. 11/8/02), 835 So.2d 703, 706, writ denied, 2002-2989 (La. 4/21/03), 841 So.2d 791. Correspondingly, when a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See State v. Green, 94-0887 (La. 5/22/95), 655 So.2d 272, 280-81. However, a trial court's legal findings are subject to a de novo standard of review. See State v. Hunt, 2009-1589 (La. 12/1/09), 25 So.3d 746, 751. In determining whether the ruling on the defendant's motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So.2d 1222, 1223 n.2 (La. 1979).
According to BRPD (Homicide Division) Detective Collins, who testified at the hearing on the motion to suppress in this case, the defendant became a suspect in this case after the police learned that the victim had phone contact with the person she was supposed to meet for a drug deal and was subsequently shot and killed at the location of the meeting on Cristy Drive. After obtaining phone records, the police were able to identify the defendant as the person who the victim communicated with to set up the meeting. Daigle subsequently identified the defendant in a photographic lineup as the person she saw shoot the victim. Through phone records obtained by the police, they further determined that the defendant called a phone number identified as belonging to Latasha Bowie, whose possible address was 3441 O'Neal Lane. After learning that the defendant's cell phone used the cell tower for that location, two detectives were directed to the scene on O'Neal Lane, consisting of a fourplex set of apartments. The officers observed a vehicle which fit the description provided by witnesses, including Kimble and Daigle, as the vehicle used by the defendant in the offense, a Chevy Impala with a pink animal print steering wheel cover.
While at the scene, Detective Woodring spoke with a neighbor who advised that the person who drives the Impala lived in apartment three, the apartment which the vehicle was parked directly behind. The neighbor further informed the detective that the apartments were numbered though they should have technically been lettered. Detective Woodring observed that the mailbox for apartment number three was open at the time. He removed and looked at (but did not open) a piece of mail which was labeled with the defendant's name, Covonta Magee, addressed at 3441 O'Neal Lane, Number C. Based upon the phone records, the information provided by the neighbor, and the address *162 confirmed by the piece of mail, the police obtained arrest warrants and search warrants for the vehicle and residence.
In Paulson, police officers drove to the defendant's house and parked in his driveway to investigate a tip they had received. An officer in one of the cars looked over to a part of the front yard and saw marijuana plants growing in a plot. Although the plants were not visible from the street because of a wooden fence, they were visible from the driveway, which had no fence or gate on it. In rejecting the defendant's claim that his right to privacy had been violated, this court found that anyone on the driveway, including mail carriers, delivery people, or neighbors, could have entered the defendant's property and observed the marijuana. This court concluded that under the circumstances the defendant did not have a legitimate expectation of privacy. Thus, the protection of the Fourth Amendment was inapplicable, and the applicability of the plain view doctrine was pretermitted, as no exception to the warrant requirement was necessary to justify admission of the evidence. Paulson, 740 So.2d at 701 ; see also State v. Lee, 439 So.2d 593, 594-95 (La. App. 1st Cir. 1983).
While the State ultimately bears the burden of establishing the validity of a warrantless search, in challenging the search a defendant bears an initial threshold burden of showing that he had a reasonable expectation of privacy in the premises. State v. Moultrie, 2015-2144 (La. 6/29/17), 224 So.3d 349, 352 (per curiam). In this case, the defendant had no reasonable expectation of privacy[5] of an unopened piece of mail in an opened mailbox located in front of a fourplex set of apartments. Thus, Fourth Amendment protections were not implicated under the instant circumstances. Moreover, we find that the preponderance of the evidence shows that the revolver would have inevitably been seized by the police in a constitutional manner. Even without the unopened mail, the police already had independent sources of the defendant's address. A warrant would have been obtained absent the piece of mail addressed to the defendant. Thus, the evidence ultimately or inevitably would have been discovered by lawful means. Considering the foregoing, we find no error or abuse of discretion in the trial court's denial of the motion to suppress. Assignment of error number one is, therefore, without merit.
CONSTITUTIONAL RIGHT TO PRESENT A DEFENSE
In assignment of error number two, the defendant argues that the trial court's evidentiary rulings violated his constitutional right to present a defense. The defendant notes that the trial court sustained the State's objection to the defense's attempt to question the State's firearm expert, Charles Watson, about the 2009 publication raised by the defense during the pretrial motion in limine to show that the reliability of firearm examinations had *163 been called into question. The defendant argues that the trial court may have been confused as to what was determined at the hearing on the motion in limine. Specifically, the defendant contends that it appears that the trial court was under the impression that the holding at the hearing resulted in an exclusion of any testimony regarding the subjective component and questionable reliability of firearms examinations. The defendant argues that the trial court's ruling violated his right to present a defense by preventing the jury from hearing testimony regarding the subjective element of firearms testing and the fact that other experts have raised questions regarding the reliability of firearms examinations.
A defendant has a constitutional right to present a defense. U.S. Const. amend. VI ; La. Const. art. I, § 16. Constitutional guarantees do not assure the defendant the right to the admissibility of any type of evidence, only that which is deemed trustworthy and has probative value can be admitted. State v. Governor, 331 So.2d 443, 449 (La. 1976). Evidentiary rules may not supersede the fundamental right to present a defense. State v. Van Winkle, 94-0947 (La. 6/30/95), 658 So.2d 198, 202. A defendant has the right to present any and all relevant evidence bearing on his innocence, unless prohibited by our federal and state constitutions, by law or by jurisprudence. State v. Ludwig, 423 So.2d 1073, 1077 (La. 1982) ; State v. Vaughn, 431 So.2d 358, 370, nn.3-7 (La. 1982) (on rehearing); State v. Patch, 470 So.2d 585, 588 (La. App. 1st Cir. 1985), writ denied, 475 So.2d 358 (La. 1985).
Preliminary questions concerning the competency or qualification of a person to be a witness or the admissibility of evidence shall be determined by the court. La. Code Evid. art. 104. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. La. Code Evid. art. 403. The trial court is vested with wide discretion in determining the competence of an expert witness, and its ruling on the qualification of the witness will not be disturbed absent an abuse of discretion. State v. Trahan, 576 So.2d 1, 8 (La. 1990).
Louisiana Code of Evidence article 702 dictates the admissibility of expert testimony as follows: If the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Notably, the Supreme Court has placed limitations on this codal provision in that, "expert testimony, while not limited to matters of science, art or skill, cannot invade the field of common knowledge, experience and education of men." State v. Stucke, 419 So.2d 939, 945 (La. 1982).
In Cheairs v. State ex rel . Department of Transp. and Development, 2003-0680 (La. 12/3/03), 861 So.2d 536, 541-42 (rehearing granted in part on other grounds), the Supreme Court recognized a distinction between challenging the reliability of the methodology used by the expert, which is addressed by a Daubert inquiry, and the expert's qualifications to testify competently regarding the matters he intends to address. The Second Circuit Court of Appeal, in State v. Williams, 42,914 (La. App. 2d Cir. 1/9/08), 974 So.2d 157, 162-63, writ denied, 2008-0465 (La. 9/26/08), 992 So.2d 983, provided the following reasoning for allowing expert testimony in the field of firearm examination:
The use of expert testimony to identify spent cartridge cases or bullets to a particular firearm has a long history in Louisiana and elsewhere and has been the subject of *164 Daubert [v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ] challenges in other jurisdictions. See, e.g., U.S. v. Diaz, 2007 WL 485967 (N.D.Cal. 2007) ("No reported decision has ever excluded firearms-identification expert testimony under Daubert."); U.S. v. Monteiro, 407 F.Supp.2d 351 (D.Mass. 2006) (collecting cases). The Monteiro case discusses the available literature and evidence regarding the error rate in firearms examination and identification and observes that the extant information about examiner error is limited in its usefulness by the methodology of the studies so far conducted on that topic.
In U.S. v. Otero, 849 F.Supp.2d 425 (D.N.J. 2012), the defendants sought to exclude the testimony of the government's firearms witnesses, which testimony included assertions that a projectile and a shell were discharged from a specific weapon. In providing the obligatory review of the Daubert standard, the Otero decision noted that "the reliability of expert testimony does not turn on the grounding of the expert's opinion in scientific principles." Otero, 849 F.Supp.2d at 431. It also reviewed the literature on error rates, concluding, "while a definitive error rate has not been calculated, the information derived from the proficiency testing is indicative of a low error rate." Otero, 849 F.Supp.2d at 433-34. Otero was decided after the release of a congressionally-funded 2009 report of the National Academy of Sciences, "Strengthening Forensic Science in the United States: A Path Forward" ("NAS Report"). Despite its recognition of the NAS Report's conclusion that "claims for absolute certainty ... may well be somewhat overblown[,]" the court nonetheless allowed the witnesses to link the projectile/casing to a specific weapon. Otero, 849 F.Supp.2d at 435.
As noted above, the use of expert testimony to identify spent cartridge cases or bullets to a particular firearm has a long history in Louisiana and elsewhere. At trial in the instant case, the defendant attempted to question Watson regarding a 2009 journal article after the State tendered Watson as an expert in firearm examination. While the defendant was not specifically allowed use of the 2009 publication to question Watson on voir dire, the defendant had already been given the opportunity to challenge the reliability of the testimony at issue at the pretrial Daubert hearing. Further, after the State elicited testimony regarding the results of testing of the evidence in this case, Watson was subject to cross-examination in the presence of the jury at which point he was asked about his methodology and whether or not his results included an error rate. We find that the trial court arguably acted within its discretion and did not impinge upon the defendant's right to present a defense at trial. Nevertheless, whether or not the ruling was erroneous, we find any such error was harmless beyond a reasonable doubt. Considering the evidence in this case, notably the eyewitness testimony, under the circumstances, it is unlikely that any additional cross-examination challenging Watson's methodology or testing would have affected the jury's assessment of the defendant's guilt. Thus, the defendant was not prejudiced by the trial court's disallowance of the use of the publication to further cross-examine Watson on the reliability of firearm examinations, and the guilty verdict actually rendered in this trial was surely unattributable to any error in this regard. See La. Code Crim. P. art. 921 ; State v. Coleman, 2014-0402 (La. 2/26/16), 188 So.3d 174, 198, cert denied, --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016) ; State v. Johnson, 94-1379 (La. 11/27/95), 664 So.2d 94, 100-01. Thus, this assignment of error is meritless.
*165 PATENT ERROR
This court routinely reviews criminal appeals for patent error. Our review has revealed the existence of a patent sentencing error in this case. The defendant filed a motion for new trial on September 24, 2015, and was sentenced on January 12, 2016. The trial court denied the motion for new trial on March 30, 2017, months after the sentencing. Louisiana Code of Criminal Procedure article 853 mandates, in relevant part that a "motion for a new trial must be filed and disposed of before sentence. See also La. Code Crim. P. art. 873. Herein, the trial court erred by sentencing the defendant before ruling on the motion for new trial. However, the defendant did not request a ruling at the sentencing and may have implicitly waived the right to a ruling prior to sentencing and the sentencing delay by announcing readiness for sentencing." Nevertheless, in State v. Augustine, 555 So.2d 1331, 1333-34 (La. 1990), the Louisiana Supreme Court indicated that a failure to observe the twenty-four hour delay provided in Article 873 will be considered harmless error where the defendant could not show that he suffered prejudice from the violation. See State v. White, 404 So.2d 1202, 1204-05 (La. 1981). In Augustine, the Supreme Court concluded that prejudice would not be found if the defendant had not challenged the sentence imposed and the violation of the twenty-four hour delay was merely noted on patent error review. Augustine, 555 So.2d at 1334. In the instant case, the defendant has not assigned error to the trial court's failure to rule on the motion prior to sentencing, nor has he contested the sentence imposed. Under these circumstances, this patent sentencing error is harmless. Furthermore, the trial court lacked sentencing discretion in this case. The defendant received a mandatory sentence of life imprisonment at hard labor. See La. R.S. 14:30.1(B). Accordingly, any error in the trial court's failure to rule on the motion for new trial prior to sentencing and observe the twenty-four hour delay is harmless beyond a reasonable doubt and does not require a remand for resentencing. See State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, 380, cert. denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997).
CONCLUSION
For the foregoing reasons, we affirm the defendant's conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED.

The grand jury indictment in this case charged the defendant along with Chelsea Daigle. Daigle testified at the instant trial and her charge of second degree murder was subsequently reduced to armed robbery with an agreed-upon sentence.

We note that the trial court did not expressly sentence defendant to hard labor or restrict eligibility of probation, parole, or suspension of sentence as to second degree murder. However, La. R.S. 15:301.1 (A) deems that those requirements are contained in the sentence, whether or not they are imposed by the trial court. See also La. R.S. 14:30.1.

According to Daigle, a third female, Brittany Kimble, rode with the victim and Daigle to the scene. However, Kimble did not approach or enter the defendant's vehicle with Daigle and the victim.

Kimble was unable to identify the shooter and did not testify at trial.

We are not persuaded by the defendant's argument that the law against theft of mail from a mailbox is relevant to the Fourth Amendment issue raised herein. As heretofore stated, the protections of the Fourth Amendment are only applicable when the accused has a legitimate expectation of privacy. If the accused has no reasonable expectation of privacy in the area invaded, neither a warrant nor an exception to the warrant requirement is needed for the seized evidence to be admissible. The exterior of the unopened piece of mail located in the defendant's open mailbox was easily within the common access and observation of any person, including mail carriers, delivery people, or neighbors. Thus, society is not prepared to recognize as reasonable any expectation of privacy in the unopened piece of mail seized in this case.